**S T A T E   O F   M I C H I G A N**
**C O U R T   O F   A P P E A L S**

---

LEVERT LYONS,

        Plaintiff-Appellee,

v

SCOTT C. KINSEL, JEFFREY D. HUNT, and
MOORE LANDREY, LLP,

        Defendants-Appellants,

and

ETHAN L. SHAW, JOHN P. COWART, SHAW
COWART, LLP, J. THOMAS RHODES III,
FILEMON B. VELA, JR., RHODES & VELA,
GORDON T. CAREY, JR., GORDON T. CAREY,
JR., PC, TARA J. WILLIAMS, and LAW
OFFICES OF JAMES SCOTT FARRIN,

        Defendants.

UNPUBLISHED
April 25, 2017

No. 329584
Wayne Circuit Court
LC No. 15-001381-NM

---

LEVERT LYONS,

        Plaintiff-Appellee,

v

SCOTT C. KINSEL, JEFFREY D. HUNT,
MOORE LANDREY, LLP, ETHAN L. SHAW,
JOHN P. COWART, SHAW COWART, LLP, J.
THOMAS RHODES III, FILEMON B. VELA,
JR., RHODES & VELA, GORDON T. CAREY,
JR., and GORDON T. CAREY, JR., PC,

        Defendants,

and

No. 329597
Wayne Circuit Court
LC No. 15-001381-NM

-1-

TARA J. WILLIAMS and LAW OFFICES OF
JAMES SCOTT FARRIN,

        Defendants-Appellants.
_____

LEVERT LYONS,

        Plaintiff-Appellee,

v                                                                No.   329607
                                                                 Wayne Circuit Court
SCOTT C. KINSEL, JEFFREY D. HUNT,                                LC No.   15-001381-NM
MOORE LANDREY, LLP, TARA J. WILLIAMS,
and LAW OFFICES OF JAMES SCOTT
FARRIN,

        Defendants-Appellees,

and

ETHAN L. SHAW, JOHN P. COWART, and
SHAW COWART, LLP,

        Defendants-Appellants,

and

J. THOMAS RHODES III, FILEMON B. VELA,
JR., RHODES & VELA, GORDON T. CAREY,
JR., and GORDON T. CAREY, JR., PC,

        Defendants.
_____

Before:  JANSEN, P.J., and BECKERING and GADOLA, JJ.

BECKERING, J. (*concurring in part and dissenting in part*).

      I concur with the majority opinion in all respects but for its conclusion regarding the trial court's exercise of personal jurisdiction over the Texas defendants, Scott C. Kinsel, Jeffrey D. Hunt, John P. Cowart, and Moore Landrey, LLP (the Moore Landrey defendants).  I would hold that subjecting these defendants to the jurisdiction of a Michigan court is not consistent with the notions of fair play and substantial justice under the Due Process Clause of the Fourteenth Amendment.

As the majority notes, this Court in *Yoost v Caspari*, 295 Mich App 209, 222-223; 813 NW2d 783 (2012), summarized the necessary analysis for determining whether a trial court has properly exercised personal jurisdiction over a defendant:

> When examining whether a Michigan court may exercise limited personal jurisdiction over a defendant, this Court employs a two-step analysis. First, this Court ascertains whether jurisdiction is authorized by Michigan's long-arm statute.[1] Second, this Court determines if the exercise of jurisdiction is consistent with the requirements of the Due Process Clause of the Fourteenth Amendment. Both prongs of this analysis must be satisfied for a Michigan court to properly exercise limited personal jurisdiction over a nonresident. Long-arm statutes establish the nature, character, and types of contacts that must exist for purposes of exercising personal jurisdiction. Due process, on the other hand, restricts permissible long-arm jurisdiction by defining the quality of contacts necessary to justify personal jurisdiction under the constitution. [Quotation marks and citations omitted.]

Courts apply a three-part test for purposes of determining whether sufficient minimum contacts exist between a nonresident defendant and Michigan to support exercising limited personal jurisdiction in keeping with due process:

> First, the defendant must have purposefully availed itself of the privilege of conducting activities in Michigan, thus invoking the benefits and protections of this state's laws. Second, the cause of action must arise from the defendant's activities in the state. Third, the defendant's activities must be so substantially connected with Michigan to make the exercise of jurisdiction over the defendant reasonable. [*Mozdy v Lopez*, 197 Mich App 356, 359; 494 NW2d 866 (1992).]

The plaintiff bears the ultimate burden of establishing personal jurisdiction over the defendants, and dismissal is appropriate if all of the facts submitted by the parties collectively fail to establish personal jurisdiction. *Mozdy*, 197 Mich App at 359-360. When conducting a due-process analysis, "a court should examine the defendant's own conduct and connection with the forum to determine whether the defendant should reasonably anticipate being haled into court there." *W H Froh, Inc v Domanski*, 252 Mich App 220, 230; 651 NW2d 470 (2002). A due-process analysis is done on a case-by-case basis. *Id*. The primary question, according to the United States Supreme Court, is "whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " *Burger King Corp v Rudzewicz*, 471 US 462, 476; 105 S Ct 2174; 85 L Ed 2d 528 (1985), quoting *Int'l Shoe Co v Washington*, 326 US 310, 320; 66 S Ct 154; 90 L Ed 95 (1945).

---

[1] "Even if a defendant's conduct places him within an enumerated category of MCL 600.705 [or MCL 600.725], a Michigan court may not exercise limited personal jurisdiction over the defendant unless to do so would not offend constitutional due process concerns." *W H Froh, Inc v Domanski*, 252 Mich App 220, 227; 651 NW2d 470 (2002).

"With respect to the first prong of the due process analysis, a defendant may submit himself to the jurisdiction of another state by reaching beyond his own state and purposefully availing himself of the privilege of exploiting the other state's business opportunities." *W H Froh*, 252 Mich App at 230-231. " 'Purposeful availment' means something akin to either a deliberate undertaking to do or cause an act or thing to be done in Michigan or conduct that properly can be regarded as a prime generating cause of resulting effects in Michigan." *Id*. at 231. This standard requires something more than passive availment of opportunities in Michigan. *Id*. However, it does not require physical presence in the state. *Id*.

The United States Supreme Court has held that a contract with an out-of-state party, by itself, cannot establish minimum contacts. *Burger King*, 471 US at 478. Therefore, the existence of the retainer agreement in the instant case is not enough, on its own, to satisfy due process. *Id*. The majority concludes that the interactions between plaintiff, in his home state of Michigan, and the Moore Landrey defendants in Texas, while representing plaintiff in an out-of-state lawsuit, were enough here. I disagree.

The United States District Court for the Eastern District of Michigan recently considered a factually similar case that analyzed, in light of the *Burger King* decision, what else was required besides a contract to establish sufficient minimum contacts. *King v Ridenour*, 749 F Supp 2d 648 (ED Mich, 2010). I find this case to be instructive.[2] In *King*, Pauline Ridenour, a Michigan woman, died due to secondhand exposure to asbestos, leading to mesothelioma. *Id*. at 649. Her son, Wallace Ridenour ("Wallace"), who also lived in Michigan, was appointed personal representative of her estate and sought to bring a wrongful death action on behalf of her estate. *Id*. Wallace signed a retainer agreement with a Dallas, Texas, law firm in order to file a lawsuit on behalf of the estate. *Id*. Shortly thereafter, an addendum was added to that retainer agreement noting that the Dallas firm would be working with the defendant, another Dallas-based firm. *Id*. at 649, 650. Subsequently, the defendant "filed a lawsuit in a Texas state court against many asbestos-related defendants on behalf of Wallace individually and in his capacity as personal representative" of the estate.[3] *Id*. at 649. Wallace was required to distribute any asbestos-related settlements equally between his siblings. *Id*. at 650. For some of the settlements, however, Wallace kept all of the money for himself. *Id*. "The siblings who received no proceeds from the later settlement phases sued [the defendant], Wallace, and Wallace's alleged boyfriend in . . . Michigan." *Id*. The defendant moved the court to dismiss the claims against it for lack of personal jurisdiction. *Id*. at 651.

---

[2] "Although lower federal court decisions may be persuasive, they are not binding on state courts." *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

[3] Wallace filed a petition to open an unsupervised independent estate in a Michigan probate court, but the defendant asserted that it did not represent Wallace in the probate action, and there was no indication of its doing so in the record. *King*, 749 F Supp 2d at 649.

-4-

In considering the issue of personal jurisdiction[4] and whether its exercise of jurisdiction over the defendant would offend notions of due process, the *King* court found two cases particularly instructive, the first being *Sawtelle v Farrell*, 70 F3d 1381 (CA 1, 1995). The plaintiffs in *Sawtelle* were New Hampshire residents whose son, a pilot in training, was killed when the airplane he was piloting was hit "over the New Hampshire-Vermont border by an aircraft from Florida." *Sawtelle*, 70 F3d at 1386. The plaintiffs contacted a California law firm to help them file a wrongful death suit on behalf of their son's estate. *Id*. The California firm referred the matter to their Washington, D.C. affiliate, where it was assigned to Virginia attorney George Farrell, who, in turn, hired counsel in Florida to file the wrongful death lawsuit. *Id*. The defendant offered the plaintiffs $155,000 to settle the suit, and Farrell and the Florida attorney advised the plaintiffs that settlement was in their best interest. *Id*. at 1386-1387. The plaintiffs accepted the offer, but later learned that an action against the same defendant was settled for $500,000. *Id*. at 1387. That discovery prompted the plaintiffs to file a legal malpractice suit in federal court in New Hampshire against the law firms that represented them in the Florida action. *Id*. The defendant law firms moved for dismissal for lack of personal jurisdiction based on a lack of sufficient contacts with the forum state of New Hampshire, and the federal district court granted the motion. *Id*.[5]

---

[4] In describing the extent of the defendant's contacts with Michigan, the *King* court noted that the defendant had a practice of representing persons or their relatives who had been physically injured by exposure to asbestos. *Id*. at 650. The plaintiffs alleged, but did not support the allegation by record evidence, that the defendant had represented "at least 'five sets' of Michigan resident clients in the [prior] 10 years," and that it had once sued Ford Motor Company in a lawsuit outside Michigan. *Id*. The *King* court noted that the defendant firm "like most firms today, has a website. The website includes an 'Asbestos Exposure Locator, ' " and contains a link to courts in the Eastern and Western Districts of Michigan. *Id*. The defendant submitted an affidavit from one of its attorneys indicating that it never advertised in Michigan. *Id*. at 651.

The *King* court rejected the plaintiffs' general jurisdiction arguments as falling "well short of approximating a physical presence in Michigan." *Id*. at 654. It noted that although the defendant had represented a few Michigan residents in the past, those clients were all referred by other attorneys. *Id*. at 653-654. It also noted that a "website's accessibility to Michigan residents is insufficient by itself to establish general jurisdiction in Michigan. A website must *specifically* target a forum in order for it to serve as a basis for general jurisdiction. . . . Because it targets all states equally, it targets no state specifically." *Id*. at 653, n 3.

[5] In federal diversity cases, the district court's personal jurisdiction over a nonresident defendant is governed by the forum's long-arm statute. *Sawtelle*, 70 F 3d at 1387.

In affirming the district court's order, a panel of the First Circuit Court of Appeals found no purposeful availment by the defendants, stating:

> At the time they agreed to provide legal advice and representation to the plaintiffs, the defendants knew the [plaintiffs] were residents of New Hampshire. Defendants' contacts with New Hampshire, however, were limited to communicating with the clients in their home state. The wrongful death litigation was prosecuted in Florida, while other legal services were rendered in Florida and other places outside New Hampshire. A review of the totality of the defendants' contacts with the forum state leaves us gravely doubtful that the defendants purposefully availed themselves of the benefits and protections of New Hampshire law." [*Id*. at 1391.]

The *Sawtelle* court held that the "mere act of agreeing to represent (and then representing) an out-of-state client, without more, does not suffice to demonstrate voluntary purposeful availment for the benefits and protections of the laws of the client's home state," *id*. at 1394, and that the "written and telephone communications with the clients in the state where they happened to live[,]" was insufficient to confer personal jurisdiction over the non-forum defendants in the forum state, *id*. at 1391-1392.

The *King* Court also found instructive the Eighth Circuit Court of Appeals' decision in *Austad Co v Pennie & Edmonds*, 823 F2d 223 (CA 8, 1987). Austad, a South Dakota corporation, hired Pennie & Edmonds, a New York law firm specializing in patent litigation, to represent it in a patent infringement matter in Maryland. *Austad*, 823 F2d at 224. During the course of discovery, Pennie & Edmonds sent an associate and a law clerk to South Dakota for three days "to review and copy documents and gather information needed to answer interrogatories." *Id*. at 225. It also made phone calls to the client in South Dakota, mailed bills there, and accepted payments from the client through checks drawn on a South Dakota Bank. *Id*. at 226. When the attorney-client relationship soured, Pennie & Edmonds withdrew their representation. *Id*. After resolution of the patent dispute, Austad filed suit against Pennie & Edmonds in a South Dakota federal district court, alleging breach of fiduciary duty and professional negligence. Pennie & Edmonds moved to dismiss the complaint due to lack of personal jurisdiction or, in the alternative, to transfer the case to New York. *Id*. The district court granted Pennie & Edmonds' motion to dismiss, Austad appealed, and a panel of the Eighth Circuit Court affirmed. *Id*. The *King* Court summarized the panel's decision as follows:

> Recognizing the existence of an attorney-client relationship between the resident client and non-resident law firm, the panel nevertheless concluded that the firm had not purposefully availed itself of South Dakota's laws in light of the following facts: the firm did not maintain an office there and none of its attorneys resided there or maintained a license to practice law there; the firm never advertised in South Dakota or sought business there; it did not actively seek out the client; the representation was arranged through a third-party who resided in New York and was a regular client of the firm; and the actions giving rise to the lawsuit took place in Maryland, not in South Dakota. In short, the court concluded, the firm's only "substantial connection" with South Dakota was its representation of a South Dakota corporation in connection with litigation taking

-6-

place wholly outside South Dakota. And the court reasoned that these connections were not enough to show purposeful availment. [*King*, 749 F Supp 2d at 655-656 (citation omitted).]

Applying the standards set forth in these two cases, the *King* court concluded that the exercise of limited personal jurisdiction was improper because the foreign defendant had not purposefully availed itself of the benefits and protections of the Michigan forum. *Id*. at 657. In granting the defendant's motion to dismiss and finding that the court lacked personal jurisdiction, the court relied heavily on three facts: (1) the defendant did not actively seek the plaintiffs' business, (2) the case was referred to the defendant by a different out-of-state firm, and (3) the defendant's only contact with the state was the retainer agreement and "the facilitative correspondence" associated therewith. *Id*. In sum, the court held "that [the defendant] has not purposefully availed itself of the benefits and protections of Michigan's laws. The absence of purposeful availment is fatal to the Court's exercise of [limited] personal jurisdiction over [the defendant]." *Id*.

I find the reasoning in *King* and the decisions upon which it relies persuasive. Like the defendant law firm in *Austad*, none of the Moore Landrey defendants in this case maintained an office in, resided in, advertised in, or actively sought out clients in Michigan. *Austad*, 823 F2d at 226. Like the defendant law firm in *King*, plaintiff's case was referred to the Moore Landrey law firm by another out-of-state law firm, which plaintiff in the instant case found by surfing the internet.[6] In other words, the Moore Landrey defendants did not reach out to plaintiff in Michigan; rather, plaintiff reached out to another law firm, which then reached out to the Moore Landrey defendants. The conference call between Kinsel, for Moore Landrey, Williams for the Farrin firm, and plaintiff, after which plaintiff agreed to and signed a retainer agreement, does not show Kinsel or Moore Landrey deliberately reaching beyond their own state and purposefully reaching into Michigan to avail themselves "of the privilege of exploiting [Michigan's] business opportunities." *W H Froh,* 252 Mich App at 231 (finding purposeful availment where the defendant intentionally reached out to Michigan by repeatedly contacting Michigan residents to solicit and cause the performance of trucking activities in Michigan). While plaintiff purposefully availed himself of the legal services of an out-of-state law firm, as *W H Froh*, 252 Mich App at 230, instructs, the focus must be on *defendants*' conduct. As is suggested by the reasoning of a panel of the First Circuit in *Sawtelle*, 70 F 3rd at 1391, merely knowing that plaintiff is a Michigan resident, agreeing to represent him in a forum yet to be determined, and communicating with him in his home state in order to facilitate legal representation does not constitute purposeful availment.[7]

---

[6] Plaintiff searched the internet for an attorney to handle a patent infringement action, which led him to the website of the Law Offices of James Scott Farrin, a firm located in North Carolina. The Farrin firm's patent attorney, Tara J. Williams, reached out to the Moore Landrey firm for assistance.

[7] Although the majority opinion deems significant the fact that Kinsel engaged in the conference call with Williams and plaintiff that resulted in plaintiff retaining the Farrin and Moore Landrey

Plaintiff contends that hiring an expert who resides in Michigan, when combined with the retainer agreement and communications between the subject defendants and plaintiff, shows purposeful availment. I disagree. Nothing in the record indicates that hiring a Michigan-based expert in the underlying case was anything other than a "random, fortuitous, and attenuated" contact of the type that cannot support the exercise of personal jurisdiction. See *Burger King Corp*, 471 US at 478. The fact that the expert—who was hired for an out-of-state case against an out-of-state defendant—happens to live in Michigan appears to be nothing more than a coincidence.

Plaintiff also contends that this case is "remarkably similar" to *Smith v Babbit, Johnson, Osborne & LeClainche, PA*, unpublished opinion per curiam of the Court of Appeals, issued May 14, 2015 (Docket No. 318326), wherein a panel of this Court found that a Michigan state court could exercise personal jurisdiction over a Florida law firm in a fee-splitting dispute, and urges the same outcome. I find the instant case factually distinguishable from *Smith*. In *Smith*, a panel of this Court concluded that Babbit "purposefully availed itself of the privileges of conducting business in Michigan[]" by contracting with a Michigan law firm (Goodman) to serve as co-counsel against a Michigan company in Florida, "as if the attorneys involved were partners and members of the same firm," and agreed to a Michigan choice-of-law provision. *Smith*, unpub op at 10. Based on the fee-sharing agreement, "Babbit should have expected that any dispute between it and Goodman would ultimately be decided in Michigan court." *Id*. None of the facts that supported this Court's conclusion of purposeful availment in *Smith* is present in the instant case.

With regard to the second and third prongs of the due process analysis, the Moore Landrey defendants pursued an out-of-state lawsuit for plaintiff, and although plaintiff contends that his underlying patent infringement case against Nike, Inc., located in Oregon, should have been pursued in Michigan, the relevant question is whether sufficient minimum contacts exist between the nonresident defendants and Michigan to support exercising personal jurisdiction. What additional contacts the Moore Landrey defendants allegedly should have had in Michigan is not material. The facts do not support a finding that the cause of action arose from the Moore Landrey defendants' activities in Michigan or that the Moore Landrey defendants' activities were so substantially connected[8] with Michigan to make the exercise of jurisdiction over these defendants reasonable. See *Mozdy*, 197 Mich App 359.

---

law firms, I do not find this fact pivotal. To hold that one is subject to personal jurisdiction and being haled into a Michigan court after being contacted by a Michigan resident by telephone and thereafter encouraging retention or making a sales pitch would render all out-of-state merchants fair game to being sued in Michigan whenever a customer calls to inquire about their products and the customer service representative triggers a sale. Although the ensuing relationship and other activities might end up qualifying as sufficient minimum contacts to justify being sued in Michigan, I do not find those contacts to be sufficient in the instant case.

[8] The Moore Landrey defendants' only "substantial connection" with Michigan was its representation of a Michigan resident in an out-of-state case, which entailed the need to communicate with plaintiff, who happened to live in Michigan, about the case and interact with

For the reasons set forth above, I would hold that the trial court erred in determining that it had personal jurisdiction over the Moore Landrey defendants.

/s/ Jane M. Beckering

---

individuals with knowledge relevant to plaintiff's underlying claim. *Mozdy*, 197 Mich App at 359; see also *Austed*, 823 F2d at 227.